UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KEVIN WATSON,

                            Petitioner,

              - against -

THE SUPERINTENDENT OF GREENE
CORRECTIONAL FACILITY,

                         Respondent.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-5098 (PKC)

PAMELA K. CHEN, United States District Judge:

Petitioner Kevin Watson petitions this Court for a writ of habeas corpus under 28 U.S.C.

§ 2254, challenging his conviction for criminal possession of a weapon in the second degree.  The

Petition is granted for the reasons set forth below.

**BACKGROUND[1]**

**I.**    **Facts Relating to Petitioner's Criminal Conduct**

On October 26, 2013, Detective Frank Muzikar ("Det. Muzikar") of the New York City

Police Department's ("NYPD") Staten Island gang squad was assigned to patrol the 120th

Precinct.  (Trial Transcript ("Tr."),[2]  Dkt. 9-14, at 38–39.)  At approximately 3:10 pm, he observed

Petitioner leave a building, "have a short conversation with a taxi driver," and then sit in the front

seat of the taxi.  (Tr. 40.)  Det. Muzikar found this suspicious and began to follow the livery cab.

---

[1] Because Petitioner was convicted at trial, the Court presumes the facts set forth herein as established and views them in the light most favorable to the prosecution.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.") (emphasis omitted).

[2] References to "Tr." refer to the internal pagination of the trial transcript (Dkts. 9-12 to 9-19), and not to the numbering created by the Court's electronic filing system or "ECF."

(Tr. 41, 52–53.)  He subsequently pulled the cab over near the corner of Bay Street and Victory Boulevard—located approximately a half-mile from the NYPD's 120th Precinct—for failing to use its turn signal at two stop signs.  (Tr. 53–54, 101.)  Det. Muzikar approached the passenger side of the taxi and saw Petitioner "with a red Samsung Galaxy phone in his hand" that had a "screen saver . . . which had firearms on it."  (Tr. 54; *see also* Dkt. 1-C (screensaver image).)  Det. Muzikar then observed the butt of a loaded firearm in a holster on Petitioner's hip.  (Tr. 55–56, 58.)  He asked Petitioner to step out of the vehicle, at which point Petitioner stated that he "ha[d] a firearm on [him]."  (Tr. 56.)  Petitioner initially stated that he had a permit for the firearm; he did not, but he did have a "premises permit" for a different firearm.[3]  (Tr. 57–58.)  Petitioner then asked Det. Muzikar to contact Crystal Armstrong, Petitioner's mother-in-law, who worked at the 120th Precinct.[4]  Petitioner stated, in sum and substance, that he was on his way to the 120th Precinct to turn in the gun pursuant to the NYPD's Gun Buyback Program (the "Program").[5]  (Tr. 58, 118–19.)

Petitioner was placed under arrest and charged with, among other things, criminal possession of a weapon in the second degree, in violation of New York Penal Law § 265.03(3).[6]

---

[3] A firearm "premises permit" "authorizes the license holder to possess a firearm at a certain location such as their home or place of business."  *Frequently Asked Questions: New Concealed Carry Law* (Aug. 27, 2020), Gun Safety in New York State, https://gunsafety.ny.gov/frequently-asked-questions-new-concealed-carry-law.

[4] According to Det. Muzikar, Petitioner initially claimed that Armstrong was his mother.

[5] The Gun Buyback Program (also known as the Cash for Guns Program) is "a program in which the NYPD will pay one hundred dollars to any individual . . . who present[s] any handgun . . . at any precinct . . . No questions asked and no identification will be required."  (Dkt. 1-7.)

[6] New York Penal Law § 265.03(3) makes it a crime to "possess[] any loaded firearm" where "such possession" does not "take place in such person's home or place of business."  N.Y. Penal Law § 265.03(3).

2

(Respondent's Brief ("Resp. Br."), Dkt. 9-21, at 1.)[7]

## II.    Pre-Trial Proceedings

In response to the charges, Petitioner asserted a defense under New York Penal Law § 265.20, i.e., excusing the unlicensed possession of a weapon where possession is for the purpose of surrendering the gun to a buyback program.  (*See* Dtk. 9-5, at 1; Pre-Trial Hearing Transcript ("Hr'g"),[8] at 20–21.)  This defense shifted the burden to the prosecution to prove beyond a reasonable doubt at trial that Petitioner did not possess the gun for that purpose on the day he was arrested and made Petitioner's intent the central issue in the case.  The prosecution filed pre-trial motions seeking to admit certain evidence going to Petitioner's intent.

On October 25, 2015, the prosecution filed a motion *in limine* seeking to admit, among other things, two photographs at trial: (1) the screensaver photograph that Det. Muzikar saw, which might have been taken on May 8, 2013, and "depicts five firearms on top of a yellow sheet" (the "Five-Gun Photo") and (2) a photograph, which might have been taken on July 10, 2013, found during a post-arrest search of Petitioner's cell phone showing "four firearms on top of a blue striped sheet" (the "Four-Gun Photo").  (Dkt. 1-6, at 2–4.)  The illegal firearm for which Petitioner was arrested was allegedly in both photographs, which were taken five months and three months before Plaintiff's arrest, respectively.  (*Id*.)

Petitioner filed a motion *in limine* seeking to cross-examine Det. Muzikar about civil rights lawsuits filed against him pursuant to 42 U.S.C. § 1983 ("Section 1983").  *See People v. Watson*,

---

[7]  Petitioner was also charged with, and convicted of, one count of criminal possession of a weapon in the fourth degree (a gravity knife) (Resp. Br., at 3), but he does not directly contest his conviction on that count.

[8]  References to "Hr'g" refer to the internal pagination of the pre-trial hearing transcript (Dkts. 9-7, 9-8, 9-9), and not to the numbering created by the Court's ECF system.

163 A.D.3d 855, 859–60 (N.Y. App. Div. 2018).

### A.     November 13, 2015 Hearing

On November 13, 2015, the presiding judge, Justice William Garnett of the Richmond County Supreme Court, held a hearing on the prosecution's motion.  (*See generally* Hr'g 1–45.) At the hearing, the prosecution stated that it wanted to use the Four-Gun Photo and Five-Gun Photo to: (1) rebut Petitioner's defenses based on the Gun Buyback Program exemption from prosecution or that he was lawfully in possession of the firearm; (2) "really to portray the picture of who this defendant is as a person . . . . He's into guns, whether they are illegal or he has a license for it"; and (3) show that Petitioner was "claiming ownership of this [illegal] . . . . It's right alongside his firearm that he's licensed to possess in his home."  (Hr'g 8.)[9]

Petitioner did not object to the introduction of the photographs on the condition that they be redacted to only show Petitioner's licensed firearm and the illegal gun at issue.  (Hr'g 10–11; *see also* Hr'g 19 ("If they want to set the timeline of when he was first in contact with [the illegal] gun . . ., that I'm not arguing with.").)  The trial court stated it would reserve decision on the motion because:

> What it comes down to for me is there's a defense of temporary lawful possession and I'm the trier of fact.  Again, it's a weighing of probative value versus prejudice. If a defendant is saying that I came upon a gun, however I came upon it, and I decided to turn it into the police as soon as I could, shouldn't the trier of fact know at one point, at least, he was in the presence of five guns?

---

[9] *See* N.Y. Penal Law § 265.20(f) (stating that the criminal possession of a firearm statute "shall not apply to . . . [a] person voluntarily surrendering [a] weapon . . , provided that such surrender shall be made to . . . a [designated] member of the [police] force or department . . . ; and provided, further, that the same shall be surrendered by such person in accordance with such terms and conditions as may be established by such . . . police force or department").

(Hr'g 18–19.)[10]  Petitioner objected to this theory of relevance, stating that it "sound[ed] like a textbook definition of propensity."  (Hr'g 19.)

With respect to Petitioner's motion *in limine*, his counsel argued that Petitioner should be permitted to inquire about the § 1983 lawsuits against Det. Muzikar because in each of "the underlying criminal cases[,] . . . Detective Muzikar, then Police Officer Muzikar, made accusations against the defendant [in those cases] which were false, they then were dismissed by the Court or were declined to be prosecuted by the District Attorney's Office."  (Hr'g 23.)  The trial court also reserved decision on Petitioner's motions.  (Hr'g 34.)

### B.    December 3, 2015 Hearing

At the pre-trial hearing on December 3, 2015, the trial court stated that it would postpone ruling on the motions *in limine* "until after the jury [was] selected" due to media attention

---

[10] Under New York law:

> In some circumstances, . . . a person may possess an unlicensed or proscribed weapon and still not be guilty of a crime because of the innocent nature of the possession.  This defense of temporary and lawful possession applies because as a matter of policy the conduct is not deemed criminal.  For example, a defendant may not be guilty of unlawful possession if the jury finds that he found the weapon shortly before his possession of it was discovered and he intended to turn it over to the authorities, or that he took it from an assailant in the course of a fight. The innocent nature of the possession negates both the criminal act of possession and the intent with which the act is undertaken when intent is an element of the crime.

*People v. Almodovar*, 62 N.Y.2d 126, 130 (1984) (citation and internal quotation marks omitted).

However, it is unclear to this Court—and appears to have been unclear during the state trial as well—what the distinction is between a defense based on returning a gun to a Gun Buyback Program and a defense of temporary and lawful possession.  (Hr'g 20–23); *see also Almodovar*, 62 N.Y.2d at 130 (citing Section 265.20 as an example of the temporary and lawful possession defense)). The trial court ultimately gave the following jury charge: "[u]nder our law in certain circumstances exemptions are defenses to criminal possession of a weapon in the second degree. Under our law a person is not guilty of criminal possession of a weapon in the second degree if such person was in the act of voluntarily surrendering the weapon to a member of the department police designated to receive it, and if such person reasonably performs the surrender in accordance with the terms and conditions established by the police department."  (Tr. 469–70.)

surrounding the case.  (Hr'g 47.)

### C.    December 7, 2015 Jury Selection

On December 7, 2015, during jury selection, the trial court granted the State's motion *in limine* as to the Five-Gun Photo, holding that:

> Detective Muzikar testified at the suppression hearing that before he saw the butt of the gun[,] he observed the defendant's cell phone displaying a picture of five guns . . . . If the detective is able to testify that [the photograph of the five firearms] looks like the picture he saw on the defendant's phone, the [] photo would tend to support his testimony about the events which transpired at the cab that day.  In addition, any alteration of the detective's testimony or the redaction of the photo to show only two guns would necessarily call into question the detective's accuracy and credibility without a sound basis.  The jury may question the officer's credibility because of the photo[']s redaction . . . or the alternative that he testified that he just saw guns.
>
> This is not a case where [the] photograph has no connection with the circumstances that led up to the seizure of the gun.  The [] photo is a part of the narrative of the events at the car and it is in the Court's judgment inextricably intertwined with the facts of the case.  In addition, in light of the announced defense, the [] photo would be probative of the issue of how likely it would be that a person so apparently enamored of guns would be in the process of surrendering to authorities when the gun was seized from him.  Therefore, the Court will allow the unredacted photo with the evidence [subject to a limiting instruction].

(Hr'g 236–37; *see also* Hr'g 254, 273, 288 (stating that photograph "is part of Muzikar's testimony").)

The trial court then heard argument with respect to the Four-Gun Photo.  Petitioner argued that the photograph was irrelevant because "with the statutory defense of [Section] 265.20, whether he possessed [the gun] two months earlier or not is not relevant as it would be if we were doing the temporary [and lawful possession defense] . . . . [I]t's not really relevant to the issue of whether he was going to the precinct" on the day he was arrested.  (Hr'g 259–60.)  Petitioner requested, in the alternative, that the photograph be redacted to only show Petitioner's licensed firearm and the illegal gun at issue.  (Hr'g 259.)  The trial court reserved decision.

### D.     December 8, 2015 Hearing

On December 8, 2015, the trial court heard further argument with respect to the Four-Gun Photo.  Petitioner argued that both the Four- and Five-Gun Photos: (1) were "evidence of a prior bad act, prior uncharged misconduct that is being used . . . to show that [Petitioner] had a propensity to possess illegal firearms"; (2) were irrelevant because, under the Section 265.20 defense, "the only issue for the jury to decide is whether he was going to the precinct on that day"; (3) were not necessary "to complete the narrative with Det. Muzikar's credibility as to whether he saw a picture with five firearms" because Petitioner did not intend to challenge that portion of the officer's testimony as the court had already ruled that the stop was legal; and (4) would mislead the jury as to whether all of the firearms pictured were real firearms.  (Hr'g 289–92, 295; *see also* Hr'g 277–78.)  The prosecution again argued that the Four-Gun Photo showed that Petitioner "possessed [the illegal gun], the length of time that he possessed it, and [that] he possessed it in his home."  (Hr'g 294–95.)  The trial court then engaged in the following colloquy with Petitioner's counsel:

> THE COURT: My question is that it seems to me what you are talking about in essence roughly is what we call confession and avoidance.  There is a confession . . . that the defendant possessed the gun.  But he didn't do it unlawfully because it was his intention when he was interdicted by the police to surrender it pursuant to a gun buyback program.  My question is this.  The jury has to make that decision.
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: Shouldn't the jury know how likely that is in light of the fact of the ubiquity of guns around the defendant?  How likely is it that he is surrendering his gun when he has multiple guns at his home and he's had them at least for four months?
>
> [DEFENSE COUNSEL]: Which goes back to the propensity evidence, Judge. . . . Showing them a picture of five guns . . . is the most prejudicial thing we can do to [Petitioner] here . . . .
>
> THE COURT: I will give a curative instruction if I do admit [the photograph] to tell [the jury] for what purpose they can use the photograph of these other guns.  To focus it on how likely, how believable it is that [Petitioner] when he got into that cab that day was going to a site to turn in the gun for cash, and that's what I have to weigh.

(Hr'g 296–97.)  The trial court again reserved decision.

## III.    Trial

Trial took place from December 9, 2015 to December 14, 2015.

### A.    Ruling on the Admissibility of the Four-Gun Photo

On the morning of trial on December 9, 2015, the trial court granted the prosecution's

motion *in limine* to admit the Four-Gun Photo, allowing it to be introduced unredacted.  (Tr. 4.)

The trial court explained its ruling:

> The Court adheres to its original decision regarding the photo allegedly seen by
> Detective Muzikar at the cab door, of course based on proper foundation being laid
> for its admission.  As to the second photo of the gun unlawfully—allegedly
> unlawfully possessed by the defendant, I will allow the People to introduce the
> photo unredacted.  The evidence is admissible to show the possession of [the illegal
> gun] by the defendant and is also admissible on the likelihood of the truth of the
> defendant's assertion that he was in the process of surrendering the gun to a
> buyback program.  Buyback programs are designed to get random guns off the
> street, not to provide persons with weapons caches to trade in an old model for a
> new one or to receive cash for other purposes.  And I cite generally the case of
> *People v. Diggins*, 11 N.Y.3d 518 (2008), a general proposition.[11]

> Of course, when either or both of these matters are introduced into evidence[,] I
> will give the jury a limiting instruction which will also be part of the Court's final
> charge to the jury.

(Tr. 4.)  The Court also denied Petitioner's motion *in limine* to cross-examine Det. Muzikar

regarding the Section 1983 lawsuits.  (Tr. 2–3.)

### B.    Det. Muzikar's Testimony

Det. Muzikar testified to the events described *supra* in Background Section I.  (Tr. 36–

136.)  After Det. Muzikar confirmed that the Five-Gun Photo was "the background of [Petitioner's]

---

[11] This Court has reviewed the *Diggins* case and is unable to identify its relevance to the
matter at issue.  Furthermore, the purpose of the Gun Buyback Program as explained by the trial
court—i.e., "not to provide persons with weapons caches to trade in an old model for a new one
or to receive cash for other purposes"—was irrelevant to any determination the jury needed to
make at trial.

8

phone" that the detective saw the day Petitioner was arrested, the prosecution moved the photograph into evidence over Petitioner's objection.  (Tr. 92–93.)  The trial court then gave the jury the following limiting instruction:

> Ladies and gentlemen of the jury, the People have put in evidence a photograph taken from the defendant's cell phone which appears to show five firearms.  First, I remind you that the defendant is on trial for possession of one .9mm Taurus handgun on October 26, 2013.  This photo was allowed into evidence by the Court for limited purposes.
>
> Number one, to complete the narrative of the seizure of the gun by the detective.  Number two, as proof of the defendant's knowing possession of the 9mm Taurus on October 26, 2013 as charged in the indictment.  Number three, to identify the handgun for which defendant had a permit on October 26, 2013.  You may use this evidence for these purposes only.
>
> This evidence was not offered and must not be considered by you for the purpose of proving that the defendant has a propensity or predisposition to commit the crime of criminal possession of a firearm as charged in this case.  If you find this evidence believable, truthful and accurate, you may consider it only for the purposes that I have explained to you and for no others.

(Tr. 93–94; *but see* Tr. 381 (THE COURT: "The defendant's possession of the gun in this case is not seriously in issue or contested.").)

On cross-examination, Det. Muzikar testified that he called Petitioner's mother-in-law, Ms. Armstrong, "approximately an hour into arrest processing."  (Tr. 119.)  The trial court sustained the prosecution's objection regarding the contents of the conversation.  (*Id.*)  Det. Muzikar also testified that he did not know whether the firearms in the Five-Gun Photo were real.  (Tr. 131.)

### C.    Tariq Chaudry's Testimony

The cab driver, Tariq Chaudry, testified through an Urdu interpreter about the events of October 26, 2013.  (Tr. 137–162.)  He testified that he was dispatched to the building where Petitioner was picked up, and that once in the cab, Petitioner told Chaudry that he "ha[d] to go to Bay [Street] and Victory [Boulevard]" in Staten Island.  (Tr. 143–44, 154.)  Chaudry further testified that at no point did Petitioner state that he wanted to go to the 120th Precinct.  (Tr. 144.)

9

### D.    NYPD Officer Anthony Santilli's Testimony

The Four-Gun Photo was introduced into evidence through NYPD Officer Anthony Santilli, a member of the NYPD's computer crimes squad.  (Tr. 235.)  During that testimony, the trial court gave the same limiting instruction that it gave during Det. Muzikar's testimony:

> Ladies and gentlemen, the People have put in evidence the photo that you now see as People's number 16 taken from the defendant's cell phone which appears to show four firearms.
>
> First, I remind you that the defendant is on trial for possession of one 9mm Taurus on October 26, 2013.  This photo was allowed in evidence by the Court for limited purposes.  First, as proof of the defendant's knowing and unlawful possession of a 9mm Taurus on October 26, 2013 as charged in the indictment in this case.
>
> Two, to identify the handgun for which defendant had a permit on October 26, 2013.  You may use this evidence for these purposes only.  This evidence was not offered and must not be considered by you for the purpose of proving that the defendant had a propensity or predisposition to commit the crime of criminal possession of a loaded firearm as charged in the indictment in this case.  If you find this evidence believable, truthful and accurate, you may consider it only for these purposes that I have explained to you and for no others.

(Tr. 275; *but see* Tr. 381 (THE COURT: "The defendant's possession of the gun in this case is not seriously in issue or contested.").)

Officer Santilli testified that the Five-Gun Photo may have been taken on May 8, 2013 and the Four Gun Photo may have been taken on July 10, 2013 if Petitioner's phone was set to the correct date and time.  (Tr. 302–03 ("[T]ime stamps on these photographs would be whatever the phone was set to at the time.").)  However, Santilli could not state definitively whether the photographs were taken on those dates, whether the firearms in the photographs were real, or whether the 9mm Taurus for which Petitioner was arrested was depicted in the Four-Gun Photo or the Five-Gun Photo.  (Tr. 302–03, 306.)[12]

---

[12] The prosecution showed an enlarged version of the Five-Gun Photo to the jury; however, the trial court ruled that Officer Santilli could not testify that the gun in the enlarged photograph

### E.      Petitioner's Motion to Dismiss and Motion to Strike

At the close of the prosecution's case-in-chief, Petitioner moved to strike the Four-Gun

and Five-Gun Photos and to dismiss the case.  (Tr. 312.)  Petitioner argued:

> First of all, based on the testimony as it came out through Officer Santilli,
> specifically to the [re]liability of the time stamps of these photographs, I want to
> renew my prior application that they be excluded.  We were expecting [Santilli] to
> come in and testify, pretty conclusively, these photographs were taken at exactly
> this time which surprisingly is not his testimony.  And given that we don't know
> what time they were actually taken, then the probative value that the People offered
> them for is not there.
>
> . . .
>
> The other motion I have is for a trial order dismissal.  Specifically referring to
> counts one and two.  Since the issue has been raised by the People's own witness,
> Detective Muzikar, about the gun buyback program, given that that issue has now
> been raised and put before the jury, the People have the burden of proving beyond
> a reasonable doubt that he was not going to the precinct.  They have not introduced
> any evidence of that whatsoever.  All they have concentrated their evidence on is
> that he possessed it on that day.  And . . . I'm not challenging that portion of the
> evidence, only the fact that they have not put in anything to show that he wasn't
> going to the precinct.

(Tr. 312–13.)  With respect to the admissibility of the photographs, the prosecution argued that

they were "still relevant to establish the voluntarily surrendering aspects of Mr. Watson's defense"

and that Officer Santilli "did testify . . . that whatever time that that phone was set to, that's the

time that the pictures were taken."  (Tr. 314.)  With respect to the motion to dismiss, the

prosecution argued:

> [Petitioner] concedes the element [of] knowingly possess[ing a] loaded and
> operable firearm.  It is not in his home or place of business.  As far as voluntarily
> surrendering, the People have established that he was not on his way to the precinct
> through testimony of the cabdriver, Mr. Tariq Chaudry as well as his trip sheet and
> the statement that he made to Detective Muzikar.

(Tr. 314.)

---

was the same gun for which Petitioner was arrested because the enlargement was "too blurry."
Instead, the parties were allowed to argue the issue to the jury.  (Tr. 200–02.)

The trial court denied Petitioner's motions, explaining that:

> Even if specific time and date cannot be attributed to the photographs, they were still on the defendant's phone.  Thus, in my judgment they would still be proof of his knowing and unlawful possession of the gun.  It would still be an issue for the jury to decide whether, in fact, Officer Muzikar saw what he said he saw, that is, the five handguns in the first photograph.  And also to identify the handgun for which defendant had a permit on October 26, 2013, which he brought up during his initial contact with the police officer. So, the motion to strike is denied.

> Motion to dismiss is denied, specifically in regard to the exemption. There is sufficient, circumstantial evidence for the People to convince a jury beyond a reasonable doubt that the defendant was not in the process of returning the gun to the precinct.  First of all, it would be highly unlikely, in my judgment, that someone would be going to a precinct to return a gun with a per se weapon in his pocket.  Also, the destination to which he was going was not the precinct.  There is sufficient prima facie evidence in the record for the People to argue that . . . they met their burden on the exemption.  So that motion is denied as well.

(Tr. 314–15.)

## F.     Testimony of Petitioner's Mother-in-Law Cheryl Armstrong

After ruling on Petitioner's motion, the trial court asked the defense for an offer of proof as to any witnesses he intended to call.  (Tr. 316.)  Petitioner's counsel stated that he intended to call Petitioner's mother-in-law, Cheryl Armstrong, a senior police administrative aide at the 120th Precinct.  (Tr. 338–39.)  This led to the following colloquy between the court and Petitioner's counsel:

> THE COURT: . . . I want to know what they're being called for.  For example, people cannot take the witness stand and say that the defendant called me and told me I was going[—]I was on my way to the 120th Precinct to hand in the gun.  That would be inadmissible hearsay.

> [DEFENSE COUNSEL]: I completely disagree with you on that . . . .

> THE COURT: . . . [I]t is not coming in.  You can make a record, that's hearsay and self-serving. . . .

> [DEFENSE COUNSEL]: All right. Your Honor, prior consistent statement is admissible in order to rebut an allegation of recent fabrication.  That is exactly what the People have done here.  The evidence is that Mr. Watson told the police officer that he was going to the precinct.  On her opening statement, [the prosecution] made

12

very clear that their position is that this was a recent fabrication.[13]  Squarely within this exception that a prior consistent statement is admissible to rebut that assertion . . . .

THE COURT:  What is the prior consistent statement?

[DEFENSE COUNSEL]: The prior consistent statement is exactly as your Honor mentioned.  That he had discussed with his wife and also with the mother-in-law who works at the 120th Precinct, that he was going to be returning[—]taking this gun into the precinct.  Additionally, the mother-in-law, who works in the precinct, is going to be coming in to authenticate the poster [for the Gun Buyback Program in the front hallway of the precinct], the photograph that she took immediately following this incident.

. . .

So, she's going to testify as to that.  Also, as to this prior consistent statement which it's squarely here.  The statement is in evidence and the prosecutor has already argued on their opening statement and will undoubtedly argue again on their closing argument that this was a recent fabrication.  Therefore, I am absolutely permitted to put in a prior consistent statement to rebut that.

THE COURT: Well, I disagree.  If that is the reason the witness is being asked to testify, I will not allow it.  You have an exception; however, if in order to establish the buyback at the precinct, the witness may testify to what was posted.  If she can say it was on or about October 26th.

[DEFENSE COUNSEL]: Your Honor, so the record's clear, I ask you please explain why this does not fall within the prior consistent statement?

THE COURT: Because, as I said, it is hearsay.  It is not a recent fabrication and it is – it is simply self-serving.  If defendant wants to tell it to the jury, it is up to him, it is his choice.  But it's not coming in the back door and you have an exception.

. . .

---

[13] The State argued during its opening statement, among other things, "[a]nd when the defendant exits the cab, he says, I have a gun on me.  Now ask yourselves, why would the defendant volunteer this information?  People submit self-preservation attempt number one.  He can't get that gun off him without risking the police seeing him or worse shooting him . . . . And this is where self-preservation attempt number two comes in.  As Detective Muzikar is placing handcuffs on the defendant, the defendant states, I have a license for it.  The People submit to you that statement was not truthful . . . . So that statement was disproven here comes self-preservation attempt number three.  The next thing he tells Detective Muzikar is, I was on my way to the 120th Precinct to turn it in . . . . Part of being a juror is using your common sense and ask yourself, does any of this make sense?  Or does the evidence show that the defendant was trying to avoid being arrested?"  (Tr. 18–20.)

13

> [DEFENSE COUNSEL]: . . . If I am not allowed to this prior consistent statement, does that mean the People are [precluded] from arguing on summation it is a recent fabrication?
>
> THE COURT: I don't see how it is a recent fabrication . . . . They can argue that defendant was lying based upon the evidence, that doesn't mean it's a recent fabrication.
>
> [DEFENSE COUNSEL]: If it is a fabrication after his arrest, then yes, it's a recent fabrication. So, if they're not going to be allowed to argue that, I have no problem; but if arguing that, I think the failure to allow us to present evidence of what was said prior to the arrest would be reversible.
>
> . . .
>
> THE COURT: Your argument is on the record. You have an exception. If I made a mistake, the Appellate Division will take care of it.

(Tr. 316–19, 321–22.) At that point, the trial day ended. (Tr. 322–24.)

The next morning, the court further explained the ruling it made the previous day regarding

Petitioner's recent-fabrication argument:

> I just want to add something to the record in regard to the legal argument that we had yesterday in regard to the defense's contention that they could put witnesses on the witness stand to testify that the defendant told them that he was going to surrender the weapon either to the precinct or pursuant to the buyback program.
>
> First, I generally cite for the record *People v. Reynoso*, 73 N.Y.2d 816 (1988).[14]
> First, it is clear beyond any doubt that the doctrine of recent fabrication has to do

---

[14] The Court notes that *Reynoso* did not actually address the issue of recent fabrication. *See generally* 73 N.Y.2d at 818–19. Rather, *Reynoso* discussed when evidence was properly admissible to show a defendant's state of mind. Specifically, the *Reynoso* defendant argued that the trial court committed an error when it "excluded a statement made to [the] defendant's sister, within two hours after a shooting, that defendant believed the victim had been armed" because it was admissible to "establish [the defendant's] state of mind[.]" *Id.* at 818. The New York Court of Appeals disagreed, holding:

> Although defendant argued that this evidence was offered solely to establish his state of mind, and thus was not hearsay . . . , the statement was irrelevant unless offered to prove the truth of the matter asserted—that defendant believed the victim was armed—and for that purpose it was inadmissible hearsay. While such declarations may be received to show the declarant's state of mind at the time the statement was made, they are not admissible to establish the truth of past facts contained in them. Here, the only relevancy of defendant's statement would have been to support his justification defense and establish the past fact of defendant's

14

with the testimony of a witness, not evidence off the witness stand.  Clearly any such testimony would be hearsay and would be self-serving.  In addition, in the position the People were in, if they wished to use any of the statements made at the car they were compelled by law to present to the jury both statements that they believe were against the defendant, as well as, the defendant's contention, so they had to present the entire conversation including one of his contentions that he was surrendering the gun to this precinct.

(Tr. 326–27.)  The court then asked Petitioner to call his first witness, to which Petitioner stated that he would call Ms. Armstrong to testify that "[s]he works at the 120[th] Precinct[,]" "to admit the [Gun Buyback Program] poster, the [Gun Buyback Program] website[,] and a photograph of the poster in the lobby of the 120[th] Precinct."  (Tr. 327.)  Then Petitioner raised a new objection to the Court's limitation of Ms. Armstrong's testimony:

> [J]ust one quick response to what you said this morning . . . . Our position is that it's not hearsay.  That hearsay is an out-of-court declaration used to prove for the truth of the matter asserted.  *However, this is something that was said prior to the arrest and, therefore, it could be considered by the jury the fact it was said and the timeline.*  Even if you reject which I disagree with the prior consistent statement argument, *it's still admissible and non-hearsay for that purpose.*

(Tr. 327–28 (emphases added).)  The court responded that the new, non-hearsay objection was "added to the record" but that it "adhered to [its] decision."  (Tr. 328.)  The court then asked Petitioner's counsel to bring Ms. Armstrong out so that she could be advised of the court's ruling.

(*Id.*)  Ms. Armstrong was brought into the courtroom and the court apprised her of the ruling it had made in response to Petitioner's protests:

> [The court:] I just want to advise you [Ms. Armstrong] that you understand that I have made a ruling in this case that you may not testify to any statement made to you by the defendant in regard to his intentions in regard to the weapon on October 26, 2013, specifically that it was his intention to turn the weapon into the precinct . . . . *And, in addition, you may not testify to any conversations that you initiated with him.  So no conversations back and forth will be allowed.*

---

prior beliefs.  The prosecutor correctly characterized the statement as inadmissible self-serving hearsay.

*Id.* at 818–19 (emphasis added).

(Tr. 329 (emphasis added).)   Ms. Armstrong stated that she understood the trial court's instructions.  (*Id.*)  Petitioner's counsel did not re-object to the trial court's additional instruction precluding Ms. Armstrong from testifying about "conversations back and forth" between her and Petitioner regarding the Gun Buyback Program.  (*See generally* Tr. 329.)[15]

In addition to her general testimony about the Gun Buyback Program, Ms. Armstrong testified that Petitioner had been to the 120th Precinct "a few times" and knew where the 120th Precinct was located.  (Tr. 347–48, 355–56.)  She further stated that the precinct was "a few blocks" from Bay Street and Victory Boulevard.  (Tr. 358.)  She also testified that she was not on duty the day that Petitioner was arrested.  (Tr. 354.)  Additionally, contrary to Det. Muzikar's testimony, Ms. Armstrong testified that she had never spoken to Det. Muzikar.  (Tr. 350.)

### G.   Petitioner's Renewed Motion to Dismiss

After the defense rested, Petitioner renewed his motion to dismiss "regarding the fact the People can't disprove this was a gun buyback situation."  (Tr. 361.)  The trial court denied the motion, stating "as I indicated yesterday there is in my judgment sufficient circumstantial evidence that a jury could find beyond a reasonable doubt that the defendant was not in the process of bringing the [gun] to the precinct or to the police when he was stopped by Detective Muzikar."  (Tr. 361.)

---

[15] Both the Appellate Division and Respondent characterize Petitioner's lack of objection after the court's ruling as fatal to Petitioner's claims regarding Ms. Armstrong's testimony on appeal.  *See Watson*, 163 A.D.3d at 866–68; (Resp. Br., Dkt. 9-21, at 16, 20.)  However, as discussed *infra* in Discussion Section I.A.2, the Court finds that the Appellate Division and Respondent misapplied New York's contemporaneous objection rule and that, in fact, Petitioner's objection to the preclusion of his conversation with Ms. Armstrong was properly preserved at trial.

### H.    Defense Summation

On December 14, 2015, the parties gave their closing arguments.  As part of the defense's closing, Petitioner's counsel stated, "I don't want you to draw any inference one way or the other from the fact that [Ms. Armstrong] didn't talk about any conversation that she may or may not have had with Mr. Watson.  There [are] legal reasons why she can't talk about that, whether it happened or not."  (Tr. 418.)   He also attempted to explain why Petitioner gave the cab driver Bay Street and Victory Boulevard as his destination rather than the 120th Precinct:

> [DEFENSE COUNSEL]: When going to a location that the cab driver may not be familiar with the streets or may not understand exactly where you're going, you give them a major landmark.
>
> [Objection overruled.]
>
> [DEFENSE COUNSEL]: In this case, doesn't that make sense?  That Mr. Watson, finding a driver who doesn't have a perfect mastery of English, maybe gave a major way point, Bay and Victory, with the intention that once he got—
>
> [Objection sustained.]
>
> [DEFENSE COUNSEL]: You may infer from these facts that it's possible. . . . So it is a fair inference that even if you tell somebody a particular intersection that may not be what your ultimate destination is.
>
> [Objection sustained.]
>
> [DEFENSE COUNSEL]: You heard in evidence from Ms. Armstrong that when you get to that intersection, if you turn left and go four block[s] you'd be at the precinct.  Whether you do that in a cab or on foot that is absolutely something that can be done and is probably often done.
>
> [Objection sustained as "to the last comment."]
>
> [DEFENSE COUNSEL]: Now let's take a look at the map. . . . So under [the prosecution's] theory he walked one-third of the way to take a cab to the last few blocks.  Does that make sense? Or if you look at where this intersection is, is it possible that this short cab ride was actually a slightly longer cab ride?
>
> [Objection sustained.]
>
> [DEFENSE COUNSEL]: Now they're saying that he got into the car at 516 Jersey Street . . .  but if you just look at the distances [in the map demonstrative], it doesn't make sense that this was his final destination. . . .

[Objection sustained. The trial court admonished Petitioner to make "[r]easonable arguments based upon the evidence."]

[DEFENSE COUNSEL]: Now if you look at where Mr. Watson got in the cab and you look at where the precinct is, what is the major directional way point between those two points?  It's Bay and Victory.

[Objection overruled.]

[DEFENSE COUNSEL]: Now this alone constitutes reasonable doubt.  Because the People have to prove to you beyond a reasonable doubt that Bay and Victory was his final destination.  He did not intend to go left and go to the precinct.

[Objection sustained.]

[DEFENSE COUNSEL]: So if there was even a possibility that Mr. Watson intended to go from Bay and Victory to the precinct than that is reasonable doubt and you must acquit.

[Objection sustained.]

THE COURT: . . . I am going to tell you that if you find that the defendant was en route to the precinct to voluntarily surrender that weapon then you must find him not guilty.  So that is what the attorney should be focusing on and nothing else in regard to the route to the precinct.

(Tr. 395–99.)

## I.     The Prosecution's Summation

In its summation, the prosecution argued, among other things:

[T]here are several reasons why we know he was not surrendering this firearm to the police.

Reason number one.  His mother-in-law works at the 120th Precinct. . . .  He has a direct line to the precinct.  If he was really turning this gun in why not give to his mother-in-law?  She testified that she helps civilians quite a few times turn in guns for cash. . . .

Another reason we know he wasn't turning this gun in, Ms. Armstrong testified she wasn't working that Saturday, October 26th.  Why wait for a day that your mother-in-law is not working at the precinct? . . . .

Reason number two we know the defendant was not in the act of voluntarily surrendering his firearm.  He's been to the 120th Precinct before and we learned from his mother-in-law.  So you can infer he knows where it's located, right? . . . He knows where that precinct is.  Yet he doesn't call his mother-in-law.

(Tr. 428–30.)

18

At the conclusion of the prosecution's summation, Petitioner objected to the foregoing arguments:

> I just want the record to be clear that I objected to the portion of the closing argument regarding the mother-in-law. Especially when the People know that I was prohibited from allowing her to testify . . . that [she] works at the precinct and the discussions that were had before he went to the precinct and how it was affected by her working there . . . . as I stated on the record[,] *it is not hearsay*.

(Tr. 448 (emphasis added).) The trial court denied Petitioner's objection again:

> [The court:] But it would have been -- if you had offered evidence the he had called -- his mother-in-law said he called me, he was turning in the gun on that day. Does that make any sense that she wasn't working that day?

> [Petitioner's counsel:] It absolutely makes sense in light of the instructions she gave him.

> [The court:] No. All right. I have made my decision.

> [Petitioner's counsel:] I just want to make sure that's in the record.

> [The court:] It's absolutely in the record.

(Tr. 449.)

### J.     Jury Charge, Deliberations, and Verdict

After the parties' summations, the trial court charged the jury. (Tr. 450–84.) As part of the instructions, the trial court reiterated its limiting instructions with respect to the Four-Gun Photo and Five-Gun Photo. (Tr. 463–65.)

The jury sent only one note during its deliberations, requesting to see, among other things, "Ms. Armstrong's testimony regarding the turning in of the firearm if it was ever discussed between her and the defendant on the day of the arrest and prior to." (Tr. 486.) Petitioner's counsel suggested the following response: "due to evidentiary rules[,] this a subject that she was not permitted to testify about and they shouldn't draw any inference either way about that if she did or didn't have a conversation." (Tr. 487.) The prosecution asked the trial court "to instruct the jury that there is no evidence of [a conversation]." (Tr. 487.) The trial court ruled:

> All the alternatives I have gone over one way or another are not fair to either party. And suggesting that it was a result of an evidentiary ruling invites the jury to speculate that there was a communication they're just being kept away from. So my response is there is nothing in the record of the trial in regard to this subject. I'm going to leave it at that.

(Tr. 488–89.)  Petitioner objected to the proposed instruction, stating, "[t]his is exactly the prejudice that Mr. Watson suffers by [the prosecution] making that improper argument . . . about his mother-in-law working at the 120th Precinct. . . .  As well as the prejudice of not being [allowed] to put in this otherwise admissible non-hearsay[.]"  (Tr. 489–90.)  The trial court then instructed the jury, "[t]here is nothing in the record of the trial in regard to this subject."  (Tr. 490–91.)

That same day, Petitioner was found guilty of, *inter alia*, criminal possession of a weapon in the second degree.  (Tr. 495–96.)

### K.    Sentencing

On January 7, 2016, Petitioner was sentenced to a five-year determinate sentence.  (Dkt. 9-20.)  On February 25, 2016, the Appellate Division, Second Department ("Appellate Division"), stayed Petitioner's sentence pending the hearing and determination of the appeal.  *Watson*, 163 A.D.3d at 855.

## IV.    Direct Appeal

On June 28, 2016, Petitioner filed his opening brief in support of his appeal to the Appellate Division.  (*See generally* Petitioner's Appellate Division Brief ("Pet. App. Br."), Dkt. 9-1.)  In relevant part, Petitioner raised the following claims: (1) the trial court erred in admitting the Four-Gun and Five-Gun Photos; (2) the trial court erred in disallowing cross-examination of Det. Muzikar about the Section 1983 lawsuits against him; (3) the trial court erred in curtailing defense counsel's summation and his right of fair comment on the evidence as to why Petitioner directed the cab driver to Bay Street and Victory Boulevard rather than the 120th Precinct; and (4) the trial

court erred in improperly limiting Ms. Armstrong's testimony regarding her conversation with Petitioner about the Gun Buyback Program.  (*Id.*)

On July 18, 2018, a panel majority affirmed Petitioner's conviction, with one justice issuing a dissent.  *People v. Watson*, 163 A.D.3d 855 (N.Y. App. Div. 2018).

### A.    Majority Opinion

The majority held, with respect to the Four- and Five-Gun Photos:

> Here, while the unredacted photographs at issue bore some marginal relevance to the testimony in this case, we agree with the defendant that said relevance was outweighed by the potential for prejudice arising from the depiction of what appeared to be other firearms in the photographs.  However, while the Supreme Court improvidently exercised its discretion in declining to redact the subject photographs, we disagree with our dissenting colleague that the defendant was "severely prejudiced" by the error.  Rather, we conclude that the evidence of the defendant's guilt, without reference to the error, was overwhelming, and there was no significant probability that the jury would have acquitted the defendant had it not been for the error.

*Id.* at 859 (internal citations omitted).

With respect to the cross-examination of Det. Muzikar, the majority held:

> We conclude that the Supreme Court did not improvidently exercise its broad discretion in precluding defense counsel from inquiring into the underlying facts of two of the three federal lawsuits at issue.  The complaints in those actions only contained broad conclusory allegations of unlawful police action by large groups of officers, and did not set forth specific acts of misconduct against Officer Muzikar individually. . . .  However, we further conclude that the court improvidently exercised its discretion in precluding cross-examination of Officer Muzikar as to the underlying facts of the third lawsuit.  The complaint in that lawsuit specifically alleged that Officer Muzikar and two fellow officers pulled the plaintiffs' vehicle over, ordered the plaintiffs out of their car, and conducted a search of the vehicle without probable cause.  Moreover, upon recovering a small folding knife from the glove compartment, the officers allegedly falsely claimed that the object was in fact a gravity knife, and placed the plaintiffs under arrest for its possession.  In our view, these specific allegations of misconduct, focusing on Officer Muzikar individually, were proper material for defense counsel's efforts to impeach the officer at trial, and the proposed questioning with regard to the underlying facts of this lawsuit should have been permitted.

Nevertheless, for the reasons discussed previously, we find that the error was harmless under the circumstances of this case.

*Id.* at 860–61 (internal citations omitted).

With respect to defense counsel's summation, the majority held:

[T]he Supreme Court appropriately limited the defense summation to matters of evidence that were properly adduced at trial. The court also properly sustained the prosecutor's objections to defense summation comments that were based on wholesale speculation, violated the court's evidentiary rulings, or were not fair comment on the evidence.

*Id.* at 868–69 (internal citations omitted).

With respect to Ms. Armstrong's testimony about *Petitioner's statements regarding his intention to return the gun*, the majority held:

Here, the court appropriately exercised its broad discretion by preventing inadmissible hearsay testimony from being elicited at trial, thereby avoiding any improper influence such evidence might have had on the jury. The court was not required to passively await an attempt to elicit such inadmissible testimony before the jury, and the inevitable objection by the prosecution that would follow, before ruling on the issue. Similarly, the court's action did not blindside the defense. Rather, the trial record demonstrates that the court expressed its concern over the potential hearsay problem in advance of the witness taking the stand and patiently discussed the issue at length with counsel outside the jury's presence before finalizing its ruling and resuming the trial. Contrary to the defendant's current contention, and the position of our dissenting colleague, the court properly ruled that the proffered hearsay testimony regarding statements made by the defendant to Armstrong was not admissible under a prior consistent statement theory.

A witness' trial testimony ordinarily may not be bolstered with pretrial statements.

However, a recognized exception to the prohibition against such bolstering permits evidence of prior consistent statements when the witness' testimony is assailed as a recent fabrication, provided that the proffered prior consistent statement was made at a time before the motive arose for the witness to testify falsely. . . . Here, as an essential part of its case-in-chief, the prosecution elicited, through the testimony of a police officer, the defendant's statement regarding his intent to surrender the gun. As was his right, the defendant elected not to take the stand and subject himself to cross-examination, instead relying upon the officer's testimony to establish his defense of temporary lawful possession of the weapon. Having so elected, he foreclosed any possibility that the prosecutor would cross-examine him and challenge his defense as a recent fabrication during such questioning. Thus, since the requisite claim of a recent fabrication was absent, the defendant could not adduce evidence of a prior consistent statement to rebut it.

22

In this regard, the defendant's assertion that, during her opening statement, the prosecutor accused him of a recent fabrication is without merit. Rather, the prosecutor merely proposed to the jury that the defendant's claim that he was going to the precinct station house to surrender the gun would be contradicted by the livery driver's testimony regarding the different destination to which the defendant had asked to be driven. Such an opening statement is not the evidentiary equivalent of confronting the defendant on cross-examination with a claim of recent fabrication and thus lacks the testimonial element required for the admission of a prior consistent statement. Moreover, the prosecutor never accused the defendant of recently altering his account or concocting a new explanation for his possession of the gun, but instead maintained that the defendant's explanation had been false from its inception. Under these circumstances, the use of an alleged prior consistent statement to rehabilitate the defendant's credibility was unavailable. . . .

*Id.* at 863–66 (citing *People v. Singer*, 300 N.Y. 120, 124 (1949); *People v. McDaniel*, 81 N.Y.2d 10, 18 (1993); *People v. Davis*, 44 N.Y.2d 269, 277–78 (1978)).

The majority went on to state that any argument that Armstrong's testimony regarding Petitioner's statements of intent, "should have been admitted as evidence of [Petitioner's] state of mind[,]" was "both unpreserved for appellate review and not before this Court for consideration on the present appeal." *Id.* at 866–67. The majority addressed this issue in the context of the dissent's reasoning:

Unlike the defendant, who solely relies on an inapplicable prior consistent statement analysis in contending in his appellate brief that it was error to exclude evidence of the statement he allegedly made to Armstrong, our dissenting colleague instead primarily argues that Armstrong's proffered testimony regarding the defendant's alleged statement to her of his intention to surrender the gun should have been admitted as evidence of the defendant's state of mind rather than for the truth of its contents, thereby obviating any hearsay objection. However, the defendant never advanced this 'state of mind' argument at the trial level, nor does he currently contend on this appeal that his purported statement [of intent] to Armstrong should have been admitted as evidence of his state of mind.

*Id.* at 866.

Separately, with respect to Ms. Armstrong's testimony about *conversations with Petitioner regarding the Gun Buyback Program's procedures*, the majority held:

The defendant *does* presently argue a "state of mind" hearsay exception with respect to the Supreme Court's expansion of its ruling to also prohibit testimony

23

regarding any *discussions between Armstrong and the defendant about the topic of surrendering a gun under the buyback program* . . . . [T]he court instructed Armstrong that she could not testify as to the defendant's prior consistent statement to her, and that she was further prohibited from testifying "to any conversations that you initiated with him.  So no conversations back and forth will be allowed." *Significantly, defense counsel voiced no objection of any kind to this additional restriction*, thereby suggesting that he had no evidence of such conversations to offer, and instead went on to elicit testimony from Armstrong regarding the buyback program. . . . Accordingly, the defendant's current contention, raised for the first time on appeal, that the court should have permitted unoffered evidence of the unspecified discussions between Armstrong and the defendant regarding the buyback program under a "state of mind" hearsay exception, is unpreserved for appellate review . . . *The defendant's failure to place this issue on the record precludes our effective review of the speculative arguments he now makes in this regard.*

We note that our dissenting colleague's suggestions that such testimony was actually offered by the defense, and that defense counsel actually argued at trial that it was admissible to establish the defendant's state of mind . . . are without support in the record.  Rather, the record reveals that, as a brief afterthought to his lengthy and legally inapposite "prior consistent statement" argument, defense counsel made only a conclusory assertion that his client's statement to Armstrong would constitute admissible nonhearsay.  Significantly, defense counsel at no point in the trial posited that any testimony by Armstrong regarding conversations with the defendant should be admitted to prove the defendant's state of mind.  Moreover, the mere perfunctory utterance that a statement was 'not hearsay' or was 'nonhearsay' completely failed to apprise the Supreme Court that the defendant was invoking the state of mind exception to the hearsay rule.

*Id.* at 866–68 (emphases added) (internal citations omitted).

## B.    Dissenting Opinion

By contrast, the dissent stated that Petitioner was "deprived . . . of his fundamental right to present a defense" because:

In sum, the Supreme Court's rulings preemptively disabled the defendant from putting on a defense. The court precluded the defendant's key witness from corroborating his defense.  The defendant was severely prejudiced by the admission into evidence of uncharged crimes. He was not permitted to use proper impeachment material for cross-examination of the arresting officer. On summation, he was not allowed to make fair comment on what was left of the evidence supporting his defense.

*Id.* at 873, 879 (Barros, J., dissenting). The dissent concluded, "[s]ince these errors, in and of themselves, deprived the defendant of his fundamental rights to present witnesses in his own defense and to a fair trial, I would reverse the judgment of conviction and order a new trial." *Id.* at 877 (Barros, J., dissenting).

### C. Leave to Appeal

Petitioner's leave to appeal to the New York Court of Appeals was denied on September 6, 2018. *People v. Watson*, 32 N.Y.3d 1009 (N.Y. 2018). Shortly thereafter, Petitioner began serving his custodial sentence. (Pet., Dkt. 1, at 4.)

## V. Federal Habeas Petition

Petitioner timely filed the instant habeas petition on September 6, 2019. (Dkt. 1.) Respondent filed his opposition on February 25, 2020. (Dkt. 9.) Petitioner filed a reply on March 17, 2020. (Dkt. 10.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To obtain relief, a petitioner must show that the state court decision, having been "adjudicated on the merits in State court proceedings," is either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013). A claim is "adjudicated on the merits" in the state court if the state court "(1) disposes of the claim

on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).

A state court's decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. *Bell v. Cone*, 543 U.S. 447, 452–53 (2005) (internal citation and quotation marks omitted). A state court's decision "involve[s] an unreasonable application of" Supreme Court precedent if there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). In other words, a state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). These standards are "difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (citation and internal quotation marks omitted).

A federal court may not grant habeas relief to a prisoner in state custody unless the prisoner has exhausted state-court remedies. *See* 28 U.S.C. § 2254(b)(1); *see also Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) ("If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]" (internal citation and quotation marks omitted)). This exhaustion requirement includes two parts. First, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Galdamez v. Keane*, 394 F.3d 68, 73

(2d Cir. 2005) (emphasis omitted) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  In New York, this means a habeas petitioner must first appeal the relevant conviction to the Appellate Division, and then seek further review by applying to the Court of Appeals for a certificate granting leave to appeal.  *Id.* at 74 (citing, *inter alia, Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000)). Second, habeas petitioners must have "'*fairly presented* [their] claims to the state courts,' such that the state court had a fair opportunity to act."  *Id.* at 73 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Aparicio*, 269 F.3d at 89–90 ("To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of the same federal constitutional claim[s] that he now urges upon the federal courts to the highest court in the pertinent state."  (internal citation and quotation marks omitted)).

## DISCUSSION

Several of the trial court's rulings in this case are troubling.[16]  However, the Court finds that only the preclusion of testimony about Ms. Armstrong's conversations with Petitioner concerning the Gun Buyback Program's procedures meets the requirements for granting habeas relief.  The Court therefore grants Petitioner's request for habeas relief based on the trial court's erroneous exclusion of Ms. Armstrong's testimony, which violated his constitutional right to due process.

### I.     Petitioner's Claim Regarding Ms. Armstrong's Testimony is Granted in Part

On direct appeal, Petitioner argued that both (1) his statements to Ms. Armstrong about his intentions to return the gun through the Gun Buyback Program, (Pet. App. Br., Dkt. 9-1, at 38–46) and (2) his conversations with Ms. Armstrong about the Program's procedures for voluntarily

---

[16] These rulings include the preclusion of Ms. Armstrong's testimony regarding her conversation with Petitioner about the Gun Buyback Program, the admission of the unredacted Four-Gun and Five-Gun Photos, the curtailment of defense counsel's summation, and the corresponding leeway given to the prosecution in its summation—as well as the cumulative effect of these rulings on the fairness of Petitioner's trial.

surrendering a gun, should have been admitted as non-hearsay statements to show Petitioner's state of mind (*id.* at 46–48).  As to Petitioner's first argument, the Court finds the exclusion of his statements of intent unreviewable because Petitioner did not raise the argument in his direct appeal and it is therefore procedurally defaulted.[17]

However, as to Petitioner's second argument, the Court agrees that his conversations with Ms. Armstrong regarding the Program's procedures for returning firearms were admissible as non-hearsay going to Petitioner's state of mind.  Further, the Appellate Division's procedural bar ruling was not an adequate state ground to support the state court judgment because the Appellate Division unevenly and erroneously applied New York's contemporaneous objection rule to Petitioner.  Thus, this Court is not required to defer to the Appellate Division's conclusion regarding Petitioner's conversations with Ms. Armstrong about the Gun Buyback Program's

---

[17] In Petitioner's direct appeal, Petitioner's counsel only argued that Petitioner's statements about his intention to return the gun were admissible as prior consistent statements.  (Pet. App. Br., Dkt. 9-1, at 46.)  Inexplicably, Petitioner's counsel did not re-argue that Petitioner's statements of intent were also admissible as non-hearsay on appeal, despite having raised that objection at trial.  *See Watson*, 163 A.D.3d at 866 (finding that Petitioner "does [not] currently contend on this appeal that his purported statement to Armstrong should have been admitted as evidence of his state of mind.  Accordingly, this issue is . . . not before this Court for consideration on the present appeal[.]" (*See also generally* Pet. App. Br., Dkt. 9-1 (only asserting Petitioner's claims regarding his statements of intent under the prior consistent statement theory but not under the non-hearsay theory).)  Accordingly, Petitioner's counsel did not "fairly present" or exhaust Petitioner's claim that his statements of intent were admissible as non-hearsay.  *See Torres v. O'Meara*, 353 F. Supp. 3d 180, 190 (N.D.N.Y. 2019) ("To properly exhaust his claims, petitioner must do so both procedurally and substantively.  Procedural exhaustion requires that the petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition . . .  Substantive exhaustion requires that the petitioner 'fairly present' each claim for habeas relief in 'each appropriate state court . . . .'" (citations and quotation marks omitted)).  As a result, Petitioner's claim regarding his statements of intent are procedurally defaulted and cannot be reviewed by this Court.  *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1727–28 (2022) ("A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures.  When the prisoner has failed to do so, and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'").

procedures.  Reaching the merits of Petitioner's claim, the Court concludes that the trial court's exclusion of those conversations deprived Petitioner of his constitutional right to present a defense and violated his due process rights.  The Court also finds that this error was not harmless. Accordingly, the Court grants Mr. Watson habeas relief and vacates his conviction and sentence.

### A.    Independent and Adequate State Grounds

#### 1.    Legal Standard

"The independent and adequate state ground doctrine first arose in the context of direct appeals to the Supreme Court from final judgments of the state courts.  Under that doctrine the Supreme Court 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).   The state law ground can be substantive or procedural and applies "in the context of federal courts reviewing applications for a writ of habeas corpus[.]"  *Id.*

"The Supreme Court repeatedly has held that 'the question of when and how defaults in compliance with state procedural rules can preclude . . . consideration of a federal question is itself a federal question.'"  *Id.* (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988)).  Specifically, a federal court "will deem a state court's finding of procedural default 'adequate' if there is a 'fair and substantial' basis in state law for the state court's determination."  *Id.* at 78.  Thus, courts in the Second Circuit have generally "deferred to findings of procedural default as long as they are supported by a 'fair or substantial basis' in state law."  *Id.* (collecting cases).

New York's codified contemporaneous objection rule preserves for review only those questions of law where "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or any subsequent time when the court had an opportunity of effectively changing the same."  N.Y. Crim. Proc. § 470.05.  The rule "require[s], at the very least, that any

matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon*, 623 N.Y.S.2d 735, 738–39 (1995); *see also Silverman v. Edwards*, 69 F. App'x 489, 491 (2d Cir. 2003) ("[A] question of law will be considered preserved for appellate review when it is interjected at the fact-finding level in such a manner and at such a time as to fairly apprise the court and the opposing party of the nature and scope of the matter contested." (quoting *People v. Jones*, 440 N.Y.S.2d 248, 261 (N.Y. App. Div. 1981))).

However, "when 'a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with . . . a "contemporaneous objection" rule,' *a federal court may review the merits of such a claim when the state court 'unevenly' applies its contemporaneous-objection rule*." *Silverman*, 69 F. App'x at 491 (emphasis added) (quoting *Peterson v. Scully*, 896 F.2d 661, 663 (2d Cir. 1990) and citing *Williams v. Lane*, 826 F.2d 654, 659 (7th Cir. 1987)). Importantly, federal courts have found that a state court "unevenly" applies the contemporaneous objection rule if the record shows that defense counsel did, in fact, lodge a contemporaneous objection and properly preserve the issue. *See id.* (ruling that the New York Appellate Division had "unevenly applied its contemporaneous-objection rule because, under New York law, defense counsel's request at trial was sufficient to preserve the issue . . . [and] because the Appellate Division, after finding [the petitioner's] claim procedurally barred, did not adjudicate the claim on the merits, [the Circuit is] not obligated to defer to that conclusion."); *Williams*, 826 F.2d at 659 (rejecting state appellate court's finding of procedural default, premised on counsel's failure to make a contemporaneous objection, where record revealed that trial counsel had, in fact, made the necessary objection).

30

2.     The Appellate Division Unevenly Applied Contemporaneous Objection
Rule

The Appellate Division unevenly applied New York's contemporaneous objection rule to

Petitioner because his counsel *did* contemporaneously object, several times, to the trial court's

exclusion of Ms. Armstrong's testimony regarding their conversations about the Gun Buyback

Program's voluntary return procedures.

First, under New York's contemporaneous objection rule, a defendant's contemporaneous

objection preserves an issue even if the objection comes *before* the court's ruling, if the court's

ruling is made in response to the defendant's objection.  *See* N.Y. Crim. Proc. Law § 470.05(2).

Section 470.05(2) provides:

> For purposes of appeal, a question of law with respect to a ruling or instruction of
> a criminal court during a trial or proceeding is presented when a protest thereto was
> registered, by the party claiming error, at the time of such ruling or instruction or
> at any subsequent time when the court had an opportunity of effectively changing
> the same.  Such protest need not be in the form of an "exception" but is sufficient
> if the party made his position with respect to the ruling or instruction known to the
> court, *or if in re[s]ponse*[18] *to a protest by a party, the court expressly decided the
> question raised on appeal*.  In addition, a party who without success has either
> expressly or impliedly sought or requested a particular ruling or instruction, is
> deemed to have thereby protested the court's ultimate disposition of the matter or
> failure to rule or instruct accordingly sufficiently to raise a question of law with
> respect to such disposition or failure regardless of whether any actual protest thereto
> was registered.

*Id.* (emphasis added).  In other words, a New York defendant is deemed to have lodged a proper

contemporaneous objection to a trial court's ruling, if that objection is the *cause* of the state court's

ruling and elicited the issue raised on appeal.  *See People v. Colon*, 847 N.Y.S.2d 44, 47 (N.Y.

App. Div., 2007) ("A 1986 amendment to the statute defining New York's contemporaneous-

objection rule, CPL 470.05(2), amended the second sentence thereof by adding to it a final clause

_____

[18] There is a typographical error in New York Criminal Procedure Law § 470.05(2).

31

providing that a timely protest is sufficient to preserve a question of law if, inter alia, 'in reponse [sic] to a protest by a party, the court expressly decided the question raised on appeal[.]'"); *id.* at 48 (noting the crucialness of rule's "requirements of a timely 'protest by a party' and a causal nexus between the protest and the question 'expressly decided' . . . ."); *People v. Reyes*, 908 N.Y.S.2d 14, 19 (N.Y. App. Div. 2010) ("[A] ruling preserves an issue of law only if there is a causal nexus between the ruling and a protest by a party[.]" (McGuire, J., concurring)).

Here, the Appellate Division held that Petitioner's argument—that a "'state of mind' hearsay exception [applied] with respect to the Supreme Court's . . . ruling to . . . prohibit testimony regarding any discussions between Armstrong and [Petitioner] about the topic of surrendering a gun under the buyback program"—was not preserved for review under New York's contemporaneous objection rule. *Watson*, 163 A.D.3d at 867–68. Specifically, the state appellate court recounted that in the record, the trial court "instructed Armstrong that she could not testify as to the defendant's prior consistent statement to her, and that she was further prohibited from testifying 'to any conversations that you initiated with him[,]'" to which "defense counsel voiced no objection of any kind to this additional restriction . . . and instead went on to elicit testimony from Armstrong" pursuant to the Court's ruling. *Id.* at 867. However, the Appellate Division inexplicably ignored the fact that the trial court's "additional restriction" was a part of the court's "ruling" in response to Petitioner's non-hearsay objection. Indeed, even the trial court characterized its ruling as such:

> [Petitioner's counsel]: . . . Our position is that [Petitioner's statements to Ms. Armstrong are] not hearsay. . . . [T]his is something that was said prior to the arrest and, therefore, it could be considered by the jury [for] the fact it was said and the timeline. Even if you reject[,] which I disagree with[,] the prior consistent statement argument, it's still admissible and non-hearsay for that purpose.

> [The court:] That's added to the record. I adhere to my decision. As I said yesterday and I will repeat today, you have an exception. . . . Please bring Ms. Armstrong in . . . *I just want to advise her of my ruling.*

(Tr. 327–38.)  Once Ms. Armstrong was brought in, the court advised her of its ruling in response

to Petitioner's non-hearsay objection:

> I just want to advise you that you understand that I have made a ruling in this case
> that you may not testify to any statement made to you by the defendant in regard to
> his intentions in regard to the weapon . . . specifically that it was his intention to
> turn the weapon into the precinct. . . . And, in addition, you may not testify to any
> conversations that you initiated with him.  So no conversations back and forth will
> be allowed.  Do you understand that ruling?

(Tr. 329.)  Thus, the Appellate Division's—and Respondent's—singular focus on Petitioner's lack

of objection *after* the ruling is completely inapposite.  Here, the objection of Plaintiff's counsel

*before* the trial court's ruling satisfies New York's contemporaneous objection rule because the

objection elicited the court's ruling.  N.Y. Crim. Proc. § 470.05(2).

Next, the Appellate Division reasoned that even if Petitioner *did* object, the objection was

a "mere perfunctory utterance that [their conversation] was 'not hearsay' or was 'nonhearsay'

[which] completely failed to apprise the [trial court] that [Petitioner] was invoking the state of

mind exception to the hearsay rule."  *Watson*, 163 A.D.3d at 868.  This Court has reviewed the

record, and finds that defense counsel did, in fact, lodge several contemporaneous objections to

the trial court's exclusion of Petitioner's statements, which sufficiently apprised the trial court that

Petitioner was seeking to admit the evidence as non-hearsay evidence of Petitioner's state of mind.

First, after the trial court further explained its rejection of counsel's prior-consistent-statement

theory, but before Ms. Armstrong testified, Petitioner clearly argued that his statements to Ms.

Armstrong were admissible for non-hearsay purposes:

> [The Court:] I just want to add something to the record in regard to the legal
> argument that we had yesterday in regard to the defense's contention that they could
> put witnesses on the witness stand to testify that the defendant told them that he
> was going to surrender the weapon either to the precinct or pursuant to the buyback
> program.
>
> First, I generally cite for the record *People v. Reynoso*, 73 N.Y.2d 816 (1988). . . .

[Petitioner's counsel:] Our position is that it's not hearsay.  That hearsay is an out-of-court declaration used to prove for the truth of the matter asserted.  However, this is something that was said prior to the arrest and, therefore, it could be considered by the jury the fact it was said and the timeline.  Even if you reject which I disagree with the prior consistent statement argument, it's still admissible and non-hearsay for that purpose.

[The court:] That's added to the record.  I adhere to my decision. . . .

(Tr. 326–28.)[19]  Then after the prosecutor's summation, Petitioner's counsel reiterated his non-hearsay objection:

[Petitioner's counsel:] I just want the record to be clear that I objected to the portion of the closing argument regarding the mother-in-law.  Especially when the People know that I was prohibited from allowing her to testify about that exact issue.

[The court:] What issue?

[Petitioner's counsel:] [T]hat his mother-in-law works at the precinct and the discussions that were had before he went to the precinct and how it was affected by her working there.

[The court:] Al[right].  Well, there again, that would have been hearsay.  I would not have allowed it.

[Petitioner's counsel:] And again, as I stated on the record it is not hearsay.  It is permissible --

[The court:] Is there anything else?  I have already decided that.

[Petitioner's counsel:] I understand that you have decided it, Judge.  But based on that, considering that they know that we were prohibited from eliciting testimony on that, they shouldn't have been able to argue to the jury that particular argument knowing that the facts are there, but I wasn't allowed to do it because of your Honor's interpretation of hearsay.

[The court:] But it would have been – if you had offered evidence he had called – his mother-in-law said he called me, he was turning in the gun on that day.  Does that make any sense that she wasn't working that day?

---

[19]  As further evidence of the trial court's understanding that Petitioner's counsel was raising—or would raise—a state-of-mind objection, the Court notes that *People v. Reynoso* was a case specifically about when testimony qualified as non-hearsay going to a defendant's state of mind.  *See supra* note 14 (discussing *Reynoso*, 73 N.Y.3d at 818–19.)

[Petitioner's counsel:] It absolutely makes sense in light of the instructions she gave him.

[The court:] No.  All right.  I have made my decision.

[Petitioner's counsel:] I just want to make sure that's in the record.

[The court:] It's absolutely in the record.

(Tr. 448–449.)  And again, after the jury sent a note requesting to see Ms. Armstrong's testimony about whether she and Petitioner ever discussed him turning in the firearm, Petitioner's counsel argued that such a question verified that his client was prejudiced by "not being able to put in this otherwise admissible *non-hearsay*" testimony from Ms. Armstrong.  (*See* Tr. 489–90 (emphasis added).)  To this final objection, the trial court responded, "I fundamentally disagree with you . . . . [but] if I made a mistake it can be reviewed."  (Tr. 490.)  Nonetheless, in the face of these repeated objections, the Appellate Division concluded that Petitioner had not preserved the issue, reasoning that "the mere perfunctory utterance that a statement was 'not hearsay' or was 'nonhearsay' completely failed to apprise the Supreme Court that the defendant was invoking the state of mind exception to the hearsay rule."  *Watson*, 163 A.D.3d at 868.  But the Appellate Division's analysis is contrary to the trial record, as well as New York and federal evidentiary law.

The Guide to New York Evidence explains that "a statement which is not offered to prove the truth of the matter asserted therein is not hearsay" and specially denotes that "[t]here are many non-truth purposes for statements offered into evidence which the Court of Appeals has recognized [including] [a] statement of a declarant which provides evidence of the declarant's state of mind, or a statement of a declarant which is heard by another and provides evidence of the hearer's state of mind (Guide to NY Evid [R]ule 8.41, State of Mind)."  *See* Note, Guide to N.Y. Evid. Rule 8.00(1).  In turn, Rule 8.41 defines the non-hearsay use of state-of-mind evidence as:

An out-of-court statement of a declarant describing the declarant's state of mind at the time the statement was made, such as intent, plan, motive, design, feeling or mental condition as it may bear on whether a person is of sound mind, but not

35

> including a statement of memory or belief to prove the truth of a fact remembered or believed, is admissible, even though the declarant is available as a witness.

*Id.* at Rule 8.41.  Indeed, the Appellate Division has recognized state-of-mind evidence as "non-hearsay" in other cases.  *See, e.g.*, *People v. Arnold*, 147 A.D.3d 1327, 1328 (N.Y. App. Div. 2017) ("Defendant contends that [his phone calls made from jail arranging for a relative to pick him up from jail] were *nonhearsay evidence of his state of mind*, that they were relevant to his claim that the police coerced his confession by promising him that he would be released if he confessed. . . . [W]e agree with defendant that the calls were admissible as circumstantial evidence of his state of mind." (emphasis added)); *People v. Machicote*, 804 N.Y.S.2d 76, 77–78 (N.Y. App. Div. 2005) ("The [trial] court properly received limited testimony by an eyewitness as to information she received from other persons, since this evidence was not received for its truth, but for the legitimate, *non-hearsay purpose of explaining that witness's state of mind*, including the thought processes leading up to her identification of defendant." (emphasis added)).  Federal evidentiary rules similarly recognize the *non-hearsay* use of state-of-mind evidence.  *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (explaining that under the Federal Rules of Evidence, "[o]ffering evidence under the state of mind exception to the hearsay rule is different than offering it for a non-hearsay purpose—here, to show declarant's state of mind.  The exception to the hearsay rule is invoked when the statement is offered for the truth of the matter asserted and shows the declarant's state of mind (e.g., 'I hate X.').  *In contrast, 'the mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind . . . of the declarant' and is not hearsay (e.g. 'I am Napoleon.')*."  (emphasis added) (quoting William Payson Richardson & Jerome Prince, PRINCE–RICHARDSON ON EVIDENCE §§ 8–106, 8-611 (Richard T. Farrell ed., 11th ed.1995).)).

Thus, under New York law, defense counsel's objection—"[o]ur position is that it's not hearsay. . . . [T]his is something that was said prior to the arrest and, therefore, it could be considered by the jury the fact it was said and the timeline. . . . [It's] admissible and non-hearsay for that purpose" (Tr. 327–28)—was sufficient to preserve an objection on the basis that the statements were admissible for non-hearsay purposes.  *See Silverman*, 69 F. App'x at 491 ("[A] question of law will be considered preserved for appellate review when it is interjected at the fact-finding level in such a manner and at such a time as to fairly apprise the court and the opposing party of the nature and scope of the matter contested." (quoting *People v. Jones*, 440 N.Y.S.2d 248, 261 (N.Y. App. Div. 1981)).

Although Petitioner's counsel never explicitly referred to "state of mind," it was clear from the context of counsel's repeated non-hearsay objections that he was relying on that ground for admissibility.  Indeed, the trial court expressed no confusion as to the basis for Petitioner's non-hearsay objections, and each time responded that Petitioner's objections were properly noted on the record and that the court's rulings on those objections would be reviewed for error.  (*See, e.g.*, Tr. 326–28, 448–49, 489–90.)  Thus, the Court finds that the Appellate Division's conclusion, that Petitioner's claim regarding his conversations with Ms. Armstrong about the Gun Buyback Program's procedures was procedurally barred, did not have a "fair and substantial" basis in state law, *Garcia*, 188 F.3d at 76, and that the Appellate Division unevenly applied the contemporaneous-objection rule to Petitioner.

Consequently, the Court is not barred from reviewing Petitioner's claim.  Moreover, because the Appellate Division did not adjudicate the claim on the merits after finding it procedurally barred, the Court is not obligated to defer to the state court's conclusion.  *Silverman*, 69 F. App'x at 491.

### B. Federal Habeas Review of State Court Evidentiary Errors

1. <u>Legal Standard</u>

"[P]urported evidentiary errors are rarely a basis for habeas relief." *Guerrero v. Lamanna*, No. 18-CV-6774 (DC), 2023 WL 1070459, at *4 (E.D.N.Y. Jan. 27, 2023) (Chin, J.). However, a "federal habeas court may, of course, review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a 'fundamentally fair trial.'" *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012) (citing *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004)); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. . . . [A]n accused . . . has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."); *but cf. United States v. Mi Sun-Cho*, 713 F.3d 716, 721 (2d Cir. 2013) ("[A] defendant does not have an unfettered right to offer testimony that is inadmissible under the rules of evidence." (quoting *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001)).

"The erroneous admission [or exclusion] of evidence constitutes a denial of due process 'only if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed in the record without it.'" *Guerrero*, 2023 WL 1070459, at *4 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)). To assess whether an erroneous exclusion of evidence in a state court trial constitutes a federal constitutional violation, "[federal courts] consider the importance of the wrongly [excluded] evidence, and the overall strength of the prosecution's case." *Jackson v. Conway*, 763 F.3d 115, 140 (2d Cir. 2014) (quoting *Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011)). Specifically, courts assess the strength of wrongly excluded "evidence by considering (1) the 'prosecutor's conduct with respect to the

evidence,' (2) *whether the evidence 'bore on an issue plainly critical to the jury's decision,'* and (3) whether the evidence 'was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative.'" *Id.* at 141 (emphasis added) (internal citations, quotation marks, and ellipses omitted).

      2.    <u>Trial Court's Exclusion of Petitioner's Conversations with Ms. Armstrong Deprived Him of Constitutional Due Process</u>

Having found that Ms. Armstrong's testimony regarding the Gun Buyback Program's procedures for voluntarily surrendering a firearm was properly admissible as non-hearsay,[20] the Court analyzes whether the trial court's erroneous exclusion of that evidence deprived Petitioner of his constitutional right to due process of law.

The Court turns to the first factor in determining the strength of the erroneously excluded conversations: the prosecutor's conduct with respect to the evidence. *Conway*, 763 F.3d at 141. Here, the prosecutor opportunistically capitalized on the limited nature of Ms. Armstrong's testimony during her summations. The prosecutor argued to the jury that Petitioner knew his mother-in-law worked at the 120th Precinct, yet did not enlist her help to return the gun:

> [Prosecutor:] So what's really in dispute here? I submit to you, ladies and gentlemen, that we have proven that the defendant was not voluntarily surrendering this firearm to the police. And there are several reasons why we know he was not surrendering this firearm to the police.
>
> Reason number one. His mother-in-law works at the 120th Precinct. You heard from Ms. Armstrong that she testified that she was a senior police administrative aide. She's been working at the precinct for eleven years. He has a direct line to the precinct. If he was really turning this gun in why not give to his mother-in-law? She testified that she helps civilians quite a few times turn in guns for cash. Does that make any sense to you? If he was in the act of voluntarily surrendering that firearm, give it to your mother-in-law who works there.
>
> Another reason we know he wasn't turning this gun in, Ms. Armstrong testified she wasn't working that Saturday, October 26th. *Why wait for a day that your mother-*

---

[20] *See* Guide to N.Y. Evid. Rule 8.00(1); Rule 8.00 notes; Rule 8.41.

> *in-law is not working at the precinct?   If you're going to take this risk of transporting this firearm to turn it in, why wait for a day she is not there to help you?*  Does that make any sense?

> Reason number two we know the defendant was not in the act of voluntarily surrendering his firearm.  He's been to the 120th Precinct before and we learned from his mother-in-law.  So you can infer he knows where it's located, right? . . . He knows where that precinct is.  *Yet he doesn't call his mother-in-law.*  He doesn't call 911 to have the police come and pick up the gun.  He doesn't wait for a day she is working.  Because he was never on his way of surrendering this gun to the precinct.

(Tr. 428–29 (emphases added).)  However, the prosecutor knew that Mr. Watson *had* spoken to

Ms. Armstrong about returning a gun to the Precinct, and that specifically Ms. Armstrong had

explained how to voluntarily return a gun through the Precinct's Gun Buyback Program but that

she had been precluded from telling the jury about those conversations by the trial court.  (Tr. 448–

49 (Petitioner's counsel objecting to the prosecution's argument because the People knew that Ms.

Armstrong was prohibited from testifying about how she gave him instructions on how to

voluntarily turn in the gun at the Precinct).)  Such evidence would have explained why Petitioner

elected to go to the Precinct on a day when his mother-in-law was not working, but the prosecutor

exploited the exclusion of the evidence, wielding Petitioner's seeming lack of knowledge

regarding the Program as evidence of his guilt.

Second, the Court assesses whether the evidence bore on an issue plainly critical to the

jury's decision, and finds that it did.  *Conway*, 763 F.3d at 141.  During deliberations, the jury sent

only a single note with two questions, one of which asked to see "Ms. Armstrong's testimony

regarding the turning in of the firearm [and] if it was ever discussed between her and the defendant

on the day of the arrest and prior to."  (Tr. 486.)  The trial court struggled with the right response:

> [The court:] All the alternatives I have gone over one way or another are not fair to either party.  And suggesting that it was a result of an evidentiary ruling invites the jury to speculate that there was a communication they're just being kept away from. So my response is there is nothing in the record of the trial in regard to this subject. I'm going to leave it at that.

(Tr. 488–89.)  Petitioner objected to the proposed instruction, stating, "[t]his is exactly the prejudice that Mr. Watson suffers by [the prosecution] making that improper argument . . . about his mother-in-law working at the 120th Precinct. . . .  As well as the prejudice of not being [allowed] to put in this otherwise admissible non-hearsay[.]"  (Tr. 489–90.)  Nevertheless, the trial court instructed the jury, "[t]here is nothing in the record of the trial in regard to this subject."  (Tr. 490–91.)  Petitioner's counsel noted the following for the record regarding the jury's reaction:

> When the jury was listening to the read backs their response was fairly flat as to the first question.  However, when you told them that there is nothing in the record about the conversation [between Ms. Armstrong and Petitioner], that [Petitioner] wasn't allowed to elicit, several heads started nodding.  Just wanted to make sure that the record is complete.

(Tr. 494.)  Later that afternoon, Petitioner was found guilty of, *inter alia*, criminal possession of a weapon in the second degree.  (Tr. 495–96.)  Based on this record, the Court finds that the excluded conversations between Petitioner and his mother-in-law clearly affected an issue essential to the jury's decision.

Lastly, the Court analyzes whether the evidence was material to the establishment of a critical fact, or whether it was instead cumulative.  *Conway*, 753 F.3d at 141.  Petitioner's intent— whether it was to surrender the gun to the Gun Buyback Program, as he told the arresting officers, or simply to possess it (without legal authority to do so)—was the *only* disputed element in the case, which the prosecution bore the burden of proving beyond a reasonable doubt.  Petitioner's knowledge of the Gun Buyback Program and the proper procedures for voluntarily surrendering a firearm through the Program was crucial to his defense, and he was prevented from fairly presenting that defense at trial.  (*See generally* Tr.)  Thus, the conversations between Mr. Watson and Ms. Armstrong of the Program's procedures were material to establishing a critical fact, and was neither cumulative nor corroborative of other evidence.

***

In sum, the excluded testimony was sufficiently material such that its exclusion could have "remove[d] a reasonable doubt" that otherwise would have existed in the record. *See Ross*, 955 F.2d at 181. Accordingly, the Court grants Mr. Watson's habeas petition on the basis that the erroneous exclusion of Ms. Armstrong's testimony regarding her conversations with Mr. Watson about the Gun Buyback Program's voluntary return procedures constituted a denial of his constitutional right to due process.

## II.    Petitioner's Cumulative Errors Claim is Denied

Petitioner's other argument on habeas review is that "[t]he culmination of errors during Mr. Watson's trial unduly prejudiced Mr. Watson and struck at the heart of Mr. Watson's defense, thus rendering his trial fundamentally unfair."[21] (Pet., Dkt. 1, at 10.) However, Petitioner's claim is denied because it is procedurally barred.

While Petitioner did raise claims on direct appeal in state court as to each of the individual errors that he identifies as part of his cumulative error argument on habeas review, he did not raise a specific cumulative-error claim in his direct appeal; rather, he simply stated that "[t]he culmination of the trial court's errors undoubtedly deprived Mr. Watson of a fair trial." (Pet. App. Br. at 61.) This is insufficient to meet Petitioner's burden of demonstrating that his cumulative error claim was "fairly presented" to the Appellate Division. *See Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) ("[I]solated phrases do not give the state court fair notice of a distinct cumulative-error claim."). "A habeas petitioner fairly present[s] a federal claim . . . when the legal basis of a claim made in state court is the substantive equivalent of the habeas claim." *Holder v. Lamanna*, No. 18-CV-7431 (PKC), 2020 WL 804902, at *5 (E.D.N.Y. Feb. 18, 2020). Courts

---

[21] Specifically, Petitioner argues that the trial court's decisions to admit two photographs of multiple firearms, curtail the cross-examination of Det. Muzikar, and preclude trial counsel's summation, in combination, violated his due process rights. (Pet., Dkt. 1, at 10–26.)

consider four factors in determining whether a "habeas petitioner has fairly presented a federal claim:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194.

In his reply to Respondent's opposition, Petitioner argues that, in his brief before the Appellate Division in support of his claims of denial of a fair trial, he cited several state cases "employing constitutional analysis in like factual situations." (Dkt. 10, at 5.) However, these cases do not address any arguments related to a cumulative error claim. Rather, they were cited in support of the specific individual claims that Petitioner raised on direct appeal. Petitioner did not make a cumulative-error claim on his direct appeal and, as a result, the Appellate Division did not rule on any such claim. Therefore, as the cumulative error claim was not fairly presented to the state court, it is unexhausted and procedurally defaulted. *Jimenez*, 458 F.3d at 149 ("Accordingly, because [the petitioner] has not properly exhausted his state remedies by fairly presenting his claim to the state courts, and may no longer do so, we agree with the respondent that [the petitioner] has procedurally defaulted his cumulative-error claim.").[22] As a result, Petitioner's claim for habeas relief on cumulative-error grounds is denied.

## CONCLUSION

Accordingly, Petitioner's writ for habeas corpus pursuant to 28 U.S.C. § 2254 is GRANTED. The conviction for criminal possession of a weapon in the second degree and

---

[22] Procedural default can be overcome by a showing of cause for the default and actual prejudice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). Petitioner has made neither showing as to his cumulative error claim.

Petitioner's sentence pursuant to the conviction are VACATED.   Respondent is ordered to discharge Petitioner from parole or provide him a new trial within forty-five (45) days of this Order.[23]   Should Respondent choose to appeal this Order, it shall advise the Court whether it is seeking to stay this Order pending appeal.   The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: September 18, 2023
        Brooklyn, New York

---

[23] The Court notes that Petitioner appears to have been released from custody on April 28, 2022, to parole.  *Incarcerated Lookup*, https://nysdoccslookup.doccs.ny.gov/ (last visited Sept. 18, 2023) (enter "16R0403" in "DIN" search field).